Lance v. Bonnell.

---

De Haven Lance et al., executors of William L. Lance,

*v.*

Mary S. Bonnell, administratrix, &c., et al.

The Penn Mutual Life Insurance Company

*v.*

De Haven Lance et al., executors of William L. Lance.

[Filed May 4th, 1899.]

1. Where a written contract upon its face vests an absolute title, those who assert that the subject-matter passed not absolutely, but only by way of pledge, must carry the burden of proving their allegation.

2. When the holder of life insurance policies on the life of another, by a title absolute on its face, openly and notoriously asserts his exclusive owner-ship of the policies, in hostility to others who claim the holding to be only

by way of pledge, and the holder and those representing him pay all the premiums both before and after the alleged redemption of the pledge, effect loans upon the policies, and accept others in their place, and the claimants or those under whom they claim, make no demand for the return of the policies, but suffer the payment of premiums, &c., to go on for seventeen years after the alleged redemption of the pledge, without question or suit to recover the policies, it is such laches on the part of the claimants that a court of equity will not enforce their claim to the moneys which may have come to be due on the policies.

3. The six-year statute of limitations will be enforced in equity, in analogy to the procedure at law, where the claimants and those under whom they claim have, for more than six years after their alleged right of action accrued, brought no suit, and where the enforcement of the complainants' claim might, by reason of their delay, work extreme hardship to the defendants.

On bill, answer and proofs.

These two suits are brought to determine the ownership of two policies of life insurance, or the right to the moneys payable thereon, and as the basis of the claims of the representatives of William L. Lance, to both policies, is the same, the causes have been heard together by agreement of all parties.

The suit regarding the Mutual Benefit company policy is brought by the executors of William L. Lance, Sr., complainants, against Mary S. Bonnell, administratrix, &c., of Samuel Bonnell, deceased, and the Mutual Benefit company, defendant, and seeks a decree that the policy on Lance's life, held by Bonnell in his lifetime, should be paid to Lance's executors, the complainants.

The other suit is brought by the Penn Mutual Life Insurance Company against the executors of William L. Lance, whose life was insured, and Mary S. Bonnell, administratrix of Samuel Bonnell, deceased, who, in his lifetime, held the policy. This bill is in the nature of an interpleader, and the complainant has been dismissed by a decree in its favor, and has paid the amount due on the policy, $1,180, with interest, into this court. The answers of the defendants are taken to be their interpleadings and make the issues in that suit.

A large number of points of law have been presented and argued, but the case is controlled almost wholly by questions of fact.

The proofs and exhibits are extremely voluminous, and yet the essential facts which dispose of the causes are within quite a narrow compass.

The policy in the Mutual Benefit Life Insurance Company of Newark is No. 61,177, and was issued directly to Samuel Bonnell on the 25th day of November, 1869, for the payment of $10,000 upon the life of William L. Lance, Sr. Another policy, No. 61,176, was issued at the same time on the same application, as to which no questions are raised, and it is mentioned simply to dismiss it from the case. Mr. Bonnell was the applicant for policy No. 61,177, as a creditor of Lance, stating that he had an interest in Lance's life to the amount of $20,000. Lance was aware that Bonnell was the applicant, and most probably knew that the policy was, on its face, issued to Bonnell absolutely and not as collateral, for Lance made and signed the required statement as to his age, condition of health, &c. Nothing on the face of the policy or the application therefor, indicated that Bonnell's ownership of it was in any way qualified, or that Lance had any interest in it whatever, save that the death of his body was to furnish the occasion for its payment.

The Penn Mutual policy for $7,000 was issued on the 10th day of April, 1869, to William L. Lance, Sr., upon his own life, on his own application, and was on the 11th day of April, 1872, assigned by Lance to Bonnell, with the assent of the company given on April 25th, 1872. This assignment is under seal, expressed to be "for value received," and purports to transfer the policy and all moneys and advantage to come due thereon, to Bonnell, without any limitation whatever.

These were the methods of vesting title in these policies in Bonnell in his lifetime, and they become important in fixing the burden of proof which must be carried by those who assert that these transactions in their inception did not convey to Mr. Bonnell an absolute, but only a qualified ownership.

The Penn Mutual policy was on April 8th, 1885, surrendered to the company by the defendant Mrs. Bonnell, administratrix of Bonnell, and a new paid-up policy for $1,180 upon Lance's

life, payable to the estate of Bonnell, was issued to Mrs. Bonnell
in its place.    On the death of Lance, both the executor of Lance
and the administratrix of Bonnell claimed the ownership of this
policy.

The Mutual Benefit policy has been adjusted as to loans, &c.,
made upon it, and ascertained to be worth $7,442.62 which the
company declares itself ready to pay to such person as this court
shall direct, the executor of Lance having notified the company
not to pay the amount due to the representatives of Bonnell.

The right of William L. Lance, Sr., to these policies is in
both suits alleged to rest upon the same series of facts arising
from the dealings between Lance and his sons and Bonnell, and
they may, therefore, properly be considered together.

William L. Lance, Sr., in his lifetime resided, while the
events here in detail were happening, near Plymouth, Penn-
sylvania.    He was the father of William L. Lance, Jr., and of
Walter W. Lance, De Haven Lance, Oscar M. Lance and
Charles Lance.    For some time previous to the year 1869, and
for several years thereafter, William L. Lance was engaged
in mining coal in Luzerne county, Pennsylvania, and had be-
come considerably indebted to various creditors and was em-
barrassed by judgments.    He was indebted, among others, to one
Payne Pettebone, of that state, and to Samuel Bonnell, Jr., then
of Elizabeth, New Jersey.    Bonnell was engaged in the coal
business in New York, and was upon terms of friendship with
Lance.    He had advanced money to the Lances which they
were unable to repay, and from all the proofs it is apparent that
he was their creditor, anxious for the payment of his claims.
In the Mutual Benefit suit the bill of complaint recites that
title to the "Gould tract," a piece of coal land in Luzerne
county, Pennsylvania, had been held in the name of William L.
Lance, Jr., the son of William L. Lance.    All of the evidence
shows, however, that both William L. Lance, Sr., and Walter
W. Lance had large equitable interests in the premises.    The
bill further recites that for the purpose of improving the prop-
erty Bonnell had given his accommodation paper, and that to
secure him from loss by reason of his advances and the giving

of this paper, Bonnell applied to the Mutual Benefit company for the policies on the life of William L. Lance, Sr., one of which policies is No. 61,177. The bill further alleges that the policies were a security to Bonnell as collateral for the payment of any indebtedness of Lance to Bonnell by reason of his advances, or growing out of the business of mining and selling coal, and that when all this indebtedness was paid, including premiums, "the said policies of life insurance were to belong to William L. Lance," and the moneys payable thereunder were to be paid to his estate and Bonnell's interest therein was to cease. This is the complainant's statement of the contract whereby William L. Lance came to have an interest in the Mutual Benefit policy.

The residue of the bill is devoted to allegations asserting the payment of all indebtedness of Lance to Bonnell, and describing the method by which that result is claimed to have been accomplished, which may be thus shortly stated. The complainant insists that Bonnell obtained the title to the "Gould tract" by an agreement with the Lances and Pettebone, whereby the property was sold at sheriff's sale under judgments against the Lances. Pettebone held title to an undivided one-half of the property and William L. Lance, Jr., to the other. The complainants claim that by the agreement of the parties named, the property was bought in by Pettebone at a nominal price, and at once conveyed to Bonnell for $162,500, upon the understanding that the whole of the Lances' indebtedness, including premiums on the life insurance, should be paid from sales of coal mined on the premises, sales of lots, &c., and that Bonnell "should hold the title to said property as security only to protect him from loss," and "under an agreement to reconvey the same when the debt due him was fully paid." The complainant further alleges that all the indebtedness, &c., owing to Bonnell was more than repaid by shipments of coal to him and by sales of lots, leases of the premises and finally by the sale of the whole property, and they pray that the Mutual Benefit company may be decreed to pay the proceeds of policy No. 61,177 to them.

The defendant Mrs. Bonnell, administratrix of Samuel Bonnell, Jr., deceased, denies that the latter held that policy as col-

lateral security, and asserts that he was always in his lifetime the absolute owner, and that the present defendant is now the absolute owner of that policy. She alleges that during his life Bonnell paid the premiums, and since his death in 1885 she has paid them; that Lance never paid any of them. She asserts that though William Lance, Sr., survived Bonnell and lived until 1895, he never claimed in his lifetime to be the owner of the policy. She further denies that Bonnell held the Gould property as security, or under an agreement to reconvey, or upon any understanding that from its proceeds his claims against Lance, including the premiums on the policy, should be paid, and that the property and policy should then belong to Lance. She insists that Bonnell was always the absolute owner of both, with no undertaking to reconvey. The defendant also insists that the claim of the executors of Lance is stale; that by their silence and delay she has been led to spend large sums of money in payment of premiums, &c.; and she also asks the protection of the statute of limitations and of the bar of a decree limiting creditors allowed her as administratrix in the Union county orphans court, as if they had been pleaded, and further, by way of amendment, sets up another bar that she claims arises under a decree made on a bill in equity filed in common pleas court No. 1, in Philadelphia, in 1879, in a suit brought by William L. Lance, then claiming to be entitled to the Gould tract, against Samuel Bonnell, Jr., in his lifetime, and others, for reconveyances of that tract, in which suit, after a hearing on the merits, it was decreed that Bonnell did not hold that property as mortgagee nor in trust, nor as security for loans, &c.

In the interpleader suit as to the ownership of the Penn Mutual policy, the answers of the defendants are to be taken as their interpleadings, and the cause has been heard on this understanding.

The executors of Lance, in that suit, state that the original policies in the Penn Mutual, No. 9,425, for $7,000, was applied for by William L. Lance on his own life, in April, 1869, and was " made payable to said Samuel Bonnell, Jr., under an agreement that the premiums paid by Bonnell should be charged to Lance."

Lance v. Bonnell.

The answer further alleges that the policy was held by Bonnell only as collateral security for the indebtedness of Lance to him, and upon an understanding that when the indebtedness of Lance to Bonnell should be paid, the policy should belong to Lance. They admit the substitution of the later policy for $1,180 in place of that first issued. The answer proceeds to allege payment of the indebtedness to Bonnell in the same method above recited in the Mutual Benefit suit, and the executors of Lance claim that they are the owners of the policy substituted, and that they should be paid the amount, $1,180, deposited in court by the Penn Mutual company in this suit.

The answer of the administratrix of Bonnell in the Penn Mutual suit makes the same denials and allegations and sets up the same defences of laches—the statute of limitations, the bar of the decree of the Union county orphans court to limit creditors and the bar of the decree in the Philadelphia equity suit, wherein it was decreed that Bonnell did not hold the Gould property as security, &c.—which are above set forth in the Mutual Benefit suit.

*Mr. D. C. Harrington* (of the Philadelphia bar), for the complainants.

*Mr. John O. H. Pitney,* with whom is *Mr. George R. Van Dusen* (of the Philadelphia bar), for the defendants.

GREY, V. C.

There is a reference in each case, in the pleadings of the executors of Lance, to a conveyance to Bonnell in his lifetime, of a tract known as the "Gould and Pringle" lot, but neither the pleadings nor the proofs show any connection between this incident and the transactions touching the life insurance policies or the "Gould tract," the proceeds from which are claimed to have discharged all the indebtedness of the Lances to Bonnell, and thus to have released the policies. This "Gould and Pringle" lot was first dealt with by an agreement dated October 7th, 1869, between William L. Lance, Sr., and Samuel Bonnell, Jr.

Lance v. Bonnell.

The former agreed to convey the lot in question to the latter in consideration of $7,500 advanced to Lance by Bonnell. Lance, it was agreed, should "have the same reconveyed to him at any time upon payment of amount of moneys *so advanced as above.*" Bonnell was given by the contract, until he was fully repaid his advances, the privilege of purchasing one-half the property for $6,000. Bonnell made the advance of the $7,500. On October 21st, 1869, Lance conveyed the entirety of the "Gould and Pringle" lot to Bonnell by deed of that date. There is no evidence whatever that the specific advance of the $7,500, the payment of which was by the agreement to entitle Lance to a reconveyance, was ever paid by him to Bonnell. A deed is offered dated February 9th, 1874, made by Samuel Bonnell and wife to George B. Bonnell, conveying the "Gould and Pringle" lot. This deed appears to have been delivered on March 25th, 1876, for a letter of that date from Samuel Bonnell to George Bonnell mentions that "I send you a deed," &c., "which I desire you to hold in trust for Mary S. Bonnell and Mrs. Lance, they to have one-half interest in the property," &c. George accepted the trust and Samuel gave to William L. Lance, Sr., a memorandum of the same trust, dated July 5th, 1876, with an appended declaration by George Bonnell of his acceptance. This declaration was assented to by William L. Lance, Sr., the royalties from the tract were for years divided under it, and the rights of Bonnell and of Lance in this particular piece of land and its profits appear to have been adjusted between William L. Lance, Sr., and Samuel Bonnell, Jr., in their lifetime, in the year 1876, upon a basis which they and those who came after them accepted without question until the suits presently under consideration were begun in 1896. The "Gould and Pringle" property presents no side which involves any dispute between the parties. The transactions concerning it were not involved in the general account of the parties, but were in their origin limited to the advance by Bonnell of the $7,500 to Lance. It is extremely probable, though there is no definite proof of the fact, that this advance was adjusted by the trust settlement securing to Mrs. Bonnell and to Mrs. Lance, to each, one-half

of the property.  Mr. Bonnell, in his letter of July 5th, 1876, produced by the Lances, does say that the consideration money was paid by Mrs. Bonnell and Mrs. Lance, and there is some other testimony which hints at this mode of settlement. My impression is that this was effected by a novation or re-arrangement of payments, whereby Mrs. Bonnell paid Mr. Bonnell his advance of $7,500, or obtained him to discharge Lance from that indebtedness as consideration for her half of the property, and Mrs. Lance procured her husband to allow her to receive by the declaration of trust the benefit of the other half.  Whatever was in fact the ground of the trust settlement, it was final and undisputed.  It had no relation whatever to the general business transactions of Lance and Bonnell, and was totally disassociated from the life insurance policies so far as William L. Lance, Sr., or Samuel Bonnell, Jr., dealt with them or either of them.  There was some testimony which was claimed to show that Mrs. Bonnell obtained the funds wherewith to pay the premiums on the policies after Bonnell's death, from the royalties paid her by the trustees of this "Gould and Pringle" lot.  The proof failed to establish the fact, but in my view, if it were indisputably shown, it would be of no significance because Mrs. Bonnell was in her own right entitled to the royalties paid her from the "Gould and Pringle" lot, and William L. Lance, Jr., and all the Lances who claim under him appear to have accepted that situation for years without question, and she might use the royalty money as she chose.

The statement of the right of the executors of Lance to relief by having the two policies decreed to be paid to them is based upon the claim that the policies were put in Bonnell's name, not upon considerations which moved from him, or which were undertaken and satisfied by him solely, but that he held them as collateral security for the payment of the general indebtedness of William L. Lance to him, upon an understanding and agreement that whenever that indebtedness should be discharged, Bonnell's interest in them ceased, and the policies should be returned to Lance ; and the further contention that the transactions incident to the taking title to the "Gould property" by

Bonnell, the profits from the workings of the mines and sales of coal and of lots therefrom; and finally, the proceeds of the sale of the residue of the premises by Bonnell more than reimbursed him for all the indebtedness which the Lances owed to him, and thus released the two policies from any further pledge to Bonnell.

It is to be noted, touching this claim, that Bonnell's title to both the policies was by the written contract, by Lance's consent or action, made absolute, in the origin of each transaction. Not a suggestion appears anywhere upon the application for the Mutual Benefit policy, or the assignment of the Penn Mutual, which hints at a pledge, or that indicates that Mr. Bonnell's right was any other than what by the written contracts it is shown to be, an absolute ownership. If a title so supported is impugned, the burden of proof to overthrow it must be carried by the party alleging it to be qualified and not absolute. *Vreeland* v. *Bramhall, 1 Stew. Eq. 85; Winters* v. *Earl, 7 Dick. Ch. Rep. 52, 588.*

There is no attempt in this case to show any other written contract or memorandum expressive of any agreement between Bonnell and Lance, whereby the former declared any trust or recognized that Lance had any interest in the policies. The effort of the complainants is to show facts which it is claimed justify an inference that the policies were held as collateral only, and not absolutely. The first policy which came to Bonnell was the Mutual Benefit in 1869. Mr. Bonnell held this policy from 1869 until his death in 1885, and the Penn Mutual policy from 1872 to 1885. William L. Lance, Sr., under whom the complainants claim title to these policies, was in close business relations with Mr. Bonnell until February 29th, 1878, when the latter finally sold the residue of the "Gould property" to the Lehigh and Wilkesbarre Coal Company. Great numbers of letters passed between Bonnell and the Lances, many conversations are shown, and their business relations must have been intimate, and towards the latter part of the time, say from 1874 to 1878, not always friendly, for differences had then arisen, and each was seeking to assert his own rights, yet neither letter

Lance v. Bonnell.

nor conversation has been shown which justifies the acceptance of the theory that these policies were held by Bonnell in pledge.

The most plausible proof which the complainants offer, is certain entries in Mr. Bonnell's books, made, most of them, by his bookkeeper, but which, it is claimed, show charges of some of the premiums on these policies against the account of William L. Lance. These entries refer to but a few of the premiums paid. The entries were begun, as to the Penn Mutual policy, before Mr. Bonnell had received his assignment of that policy, when it still stood as issued, in Lance's name, and when Mr. Bonnell, who advanced the premiums for Lance, might properly have charged them against Lance's account. They were continued by Mr. Bonnell's bookkeeper after Mr. Bonnell had become the owner of the policy by Lance's assignment and had begun to pay as owner, and the Mutual Benefit premiums were, some of them, likewise entered by the bookkeeper under Lance's account. There was no proof of express direction by Mr. Bonnell to his bookkeeper to make these entries, and they appear to have been first brought to his attention in 1874. He was examined, in the trial of the equity suit, in Philadelphia common pleas, 1881, and there testified touching the life insurance entries against Lance's account—that he did not know of them until 1874; that he then told Tuthill (the bookkeeper) to take them out, and that he would have told him before if he had known of them. Tuthill (the bookkeeper) supports this testimony by his evidence, both in the Philadelphia equity suit and in this cause. Bonnell also testified in the Philadelphia case that the insurance was done for his (Bonnell's) convenience, and that Lance never paid any of the premiums. He further testified :

"I did not consider that the charge of life insurance made much difference, because, when the account was rendered, Mr. Lance would object to it as being money which was paid by me for my convenience."

Here was an explicit denial by Bonnell that these entries expressed the true relations of the parties as to the life insurance. Mr. Lance was alive at that time and was the principal witness in the equity suit, and was also largely interested him-

self in the success of the complainant in that suit, in which Bonnell testified. The latter's testimony as to the life insurance was given in response to the examination by the Lances' counsel, obviously directed to show that these policies were held by Bonnell as collateral. His explicit denial that they were so held was a direct challenge to Mr. Lance to refute these statements if they were untrue, but nowhere in Mr. Lance's testimony does he even attempt to dispute Mr. Bonnell's statements, nor did he ever afterwards, at any time during his life, set up in any way any claim to these policies.

There is one entry of premiums charged in Mr. Bonnell's books against Lance's account, on the Penn Mutual policy, which is in Mr. Bonnell's handwriting. This was made on the day on which that policy was assigned to him, and before the assignment had been approved by the company. No evidence whatever of the occasion for this entry accompanies the proof of it. The assignment of that policy was made in terms to vest an absolute interest in Bonnell, and it is much more reasonable to infer that this single entry charging to Lance's account the premiums due at the time of the assignment, was made as part of the bargain between them for the transfer of the policy to Bonnell, to the effect that Lance should be responsible for this, the last premium falling due while he held the policy, than to assume without proof that this entry is evidence contradictory of their expressed bargain made on the same day.

In all the great bulk of testimony submitted in the cause there is but little reference of any kind to the life insurance policies.

On October 31st, 1870, Bonnell wrote to Lance, "Mr. McCorkle says *your policy* is good now you will have to pay up this year so as to keep it good, which I would do (at) once." At this time Lance was the holder of the Penn Mutual policy which was issued to Lance on April 10th 1869, and afterwards assigned by him to Bonnell on April 11th, 1872. If the mention in this letter of "your policy" has any relation to either policy now in dispute (and there is no proof that it has), it must be inferred that it was to the policy in the Penn Mutual then

held by Lance, which Bonnell advises him to "keep good." This incident of proof has therefore no significance on the present issues.

William L. Lance, Jr., testifies that about 1869 or 1870 Bonnell said to him that they (the Lances) were not shipping enough coal to reduce the debt, and "I have no security to show this thing except the *insurance on your father*." The time when this conversation took place is not stated with enough certainty to make proof of much value, nor is there anything narrated which indicates that the phrase "*insurance on your father*" relates to either of the policies now in dispute. The Mutual Benefit policy was the first obtained by Bonnell and came to him on November 25th, 1869, but the conversation which took place in 1869 or 1870 may have been held before he got this policy and may refer to another insurance. The statement itself is not necessarily inconsistent with an absolute holding by the notice of the insurance referred to, for policies which are absolutely held on the life of a debtor may be fairly described as securities. The admission of Bonnell is too dubious in its character to be of any weight.

Joseph Lance testified to a conversation which he overheard in October, 1869, between his father, William L. Lance, Sr., and Mr. Bonnell, just after the Avondale mine disaster in September, 1869. He swears that Mr. Bonnell, in speaking of the dangers incident to mining, said to William L. Lance, Sr., "You should have insurance on your life; it is a good thing to have for your children," &c. The witness was then a boy of fifteen. The alleged statements of Mr. Bonnell could not possibly have referred to either of the policies now in dispute, as Mr. Bonnell did not receive the first of them until November 25th, 1869, about two months after the alleged statement. Nothing in this conversation identified the matter talked of with the policies, the ownership of which is now under consideration.

A certificate of acknowledgment of a loan upon the Mutual Benefit policy No. 61,177, which is dated November 25th, 1871, signed "W. L. Lance, per S. Bonnell, Jr.," for $490, in favor of the Mutual Benefit company, is offered in evidence. This

signature is Mr. Bonnell's handwriting, but there is no proof whatever that Lance either arranged the loan, or paid it, or even knew of it, or that his name ever appeared until, on the call of the counsel of the complainant in this suit, the Mutual Benefit company produced the certificate.

Loans were made on both policies in dispute, but they were all to Bonnell and for his benefit.

The foregoing is a short summary of the evidence by which the complainants claim that they show that the written contracts under seal which vested absolute title to the policies in question in Mr. Bonnell should be reformed, and held to have passed to him only a qualified interest by way of collateral security.

The proof on the side of the defendant, apart from the written contract which gave Bonnell absolute title, is much stronger to show that his title was complete and not limited, than the proof offered to overcome the written contract. In point of fact there is no proof whatever that Mr. Lance ever paid any premium or asserted any ownership in these policies after they had come to Mr. Bonnell by a title absolute on its face. If the policies were in truth held by Mr. Bonnell as collateral security for the payment of Lance's debts, then Mr. Lance must have known that fact as to the Mutual Benefit policy since November, 1869, and as to the Penn Mutual policy since April 11th, 1872.

The claim of the executors of Lance is, that the policies were to be held by Bonnell until the Lances paid their debt to him, but there is not even a claim that Bonnell contracted to continue payments for the Lances' benefit after their debts were paid. Yet they say, as is hereinafter shown, that all their debts to Bonnell were paid in 1878, and they admit that they set up no claim to the policies when the debt was discharged, but suffered Bonnell to continue to pay the premiums, and of these payments they now claim the benefit.

The complainant has submitted no proof which is sufficiently weighty to overcome the face of the written contracts which vested absolute title to the insurance policies in question, in Mr. Bonnell.

If this view is erroneous and the complainants claiming under

William L. Lance, Sr., have shown such proofs, it would still appear to be inequitable to give effect to a claim so stale that no one ever knew it to be formulated or presented during seventeen years of hostile feeling between the parties, nor until ten years after one of the principal actors had died, and a year after the other had been called away. During all this period of quietude the title to both policies stood absolutely in the name of Mr. Bonnell or his representatives without challenge, and they spent their money upon them, pledged them, varied them at will, without let or hindrance of the Lance claimants. Death has now removed every actor in the transactions which the complainants declare created and secured their rights, thus destroying testimony which rested (if it ever existed) wholly in parol proof. The defendant, Mrs. Bonnell, is peculiarly helpless under this attack, as she obviously never had even the observation of the matter, which enables the children of Lance to give some information of these old transactions. A review of the facts, showing the non-action of the Lances, will illustrate this point.

The theory of the complainants is that the transactions regarding the "Gould tract," in 1871, resulted in vesting title in that tract in Bonnell; that this title to that land and the policies here in dispute were granted to Bonnell upon an agreement that the proceeds from the products and sale of the Gould tract should pay to him all indebtedness which the Lances owed him, and that when that was accomplished the "Gould tract" or the balance of its proceeds, and also the policies, should belong to the Lances. The complainants insist that the sales of coal, of lots of land and finally of the residue of the tract, overpaid all the indebtedness of the Lances to Bonnell, and thus entitled them to the policies. Accepting this theory to be true for the purpose of ascertaining the duty of the Lances in the premises, to prosecute their alleged right to the policies without laches, it must be noted that Bonnell's final transaction touching the Gould tract, was the sale of the residue, in February, 1878, to the Lehigh and Wilkesbarre Coal Company. The whole of the proof shows that this was done by Bonnell openly, and as absolute owner with the full knowledge of the Lances, and without in any

18

way recognizing their claim, the validity of which he always denied. Mr. Lance and all his sons were thus certainly as early as February, 1878, put upon notice that Bonnell's position as to the Gould tract whatever it had been theretofore, was then asserted in his own right and in hostility to their claim. Then came the equity suit in Philadelphia brought in December, in 1879. This related wholly to the Gould land, and set up no claim to the insurance policies.

The hostility of Bonnell's claims and conduct was recognized by this equity suit of William L. Lance, Jr., against him, brought in the Philadelphia court. William L. Lance, Jr., then claimed to hold the legal title to the Lance interest and was supported by William L. Lance, Sr., and the other sons in the prosecution of that suit against Bonnell. The Lances set up the same claims, that Bonnell took the "Gould tract" as collateral security, and that he had been fully paid, which are now and here asserted. The Lances were defeated in the Philadelphia equity suit, they now insist, solely for want of proper parties to that suit.

Their contention in this respect is not supported by the proof. It appears by the master's report in that case, that the proper complainant parties were not all before the court, but that the complainant insisted notwithstanding that "the cause should be decided on its merits." The master did so decide it against the Lance claim. Exceptions were taken by them to the master's report. The thirteenth exception is "the master erred in finding that Samuel Bonnell, Jr., did not hold as mortgagee;" the fourteenth is, "the master erred in finding that no equity of redemption is vested in William L. Lance, Jr." The court dismissed the exceptions and confirmed the master's report. The cause was removed to the supreme court and the third and fourth assignments of error raised the same questions. The supreme court affirmed the judgment, with an intimation that it was inclined to the opinion that "Bonnell held the balance of the money raised from the sale, if any such balance there was, as trustee for the Lances." This was in 1886. No action appears to have been taken by the Lances on this intima-

Lance v. Bonnell.

-tion, and the judgment against them upon the merits of the case, considered at their request, pronounced by the court below appears to have been left undisturbed.

Irrespective of any effect of this litigation to establish a final judgment upon the same subject-matter between the parties here contending, the facts recited certainly brought knowledge to the Lances that Bonnell's holding and dis- position of the Gould tract were adverse to their claim then asserted, and now here again presented and prosecuted. Acquiring this knowledge in 1878, when Bonnell finally dis- posed of the Gould tract without regarding their supposed rights, they were bound to prosecute with due diligence their claim to the policies which they assert were freed from pledge by that disposition of the "Gould tract" and the ensuing events of that year, or they must suffer the consequences of their laches. Neither William L. Lance, Sr., in his lifetime, nor any other of the Lance family, ever took any steps even to demand the return of the policies from Mr. Bonnell in his lifetime, or from the defendant his administratrix, after his death, or to prove any claim against his estate for the alleged overpayment of the indebtedness of the Lances to him, result- ing from his disposition of the "Gould tract."

Meanwhile Mr. Bonnell, relying upon his absolute holding of title to the policies, and the entire absence of any dispute of it or contrary claim by the Lances, paid all the premiums upon the policies from 1878 to 1885, the time of his death, effected loans upon them and dealt with them as his own. By their own argument, as above shown, the complainants' claim that the debt due Bonnell, which released the policies from pledge to him, was more than satisfied in 1878, they might then have de- manded the return of the policies. No such demand was made. The proofs show that in 1881 Mr. Bonnell, in the Philadelphia equity suit, prosecuted in the interests of all the Lances, openly asserted his absolute ownership of these policies. His assertion was not contradicted nor was any demand made for them by the Lances. Bonnell died in 1885. No debt was, by the Lances, claimed against his estate, nor were any steps taken to recover

the policies.   William L. Lance, who is alleged to have made
the contract pledging the policies, and under whom the com-
plainants derive their title, was living during all this time and
active in the controversy, but gave no sign that he claimed any
interest in them.   It was after his death that the first disclosure
was made that the Lances asserted rights in these policies.

For more than twenty-three years, Mr. Bonnell in his
lifetime and his wife since his death, have paid all the pre-
miums on the policies, have effected loans on them, have
surrendered the original Penn Mutual policy and accepted a.
substitute, and in fact have paid out an amount of money upon
the policies very nearly equal to the sum presently payable
upon them.   The complainants strenuously insist not only that
they shall have the benefit of the policies but that no allow-
ance shall be made either to Bonnell's estate for any premiums
paid by him in his lifetime or to Mrs. Bonnell for those paid
by her since his death.   The effect of such a determination
would be to give to the Lances the full benefit of the poli-
cies and of the payments of premiums by Mr. Bonnell, though
these payments were made at least since 1878, under an open
claim of ownership of the policies and hostile to the present
claim of the Lances, and known by them to be so; and also the
benefit of Mrs. Bonnell's payments made since Mr. Bonnell's
death, notwithstanding no claim or notice of claim to the policies
was ever made or given to her in any capacity.   Such neglect
to take any steps to recover the policies or even to claim them,
extending from 1878 to 1895, while those in possession of them
holding by a title absolute on its face, were to the knowledge of
the claimants openly and irretrievably acting as absolute owners,
was laches of such a character that it would be inequitable
presently to enforce the claimants' rights.

There is an attempt to answer this apparent assent of Mr.
Lance during his whole life to the unqualified title of Mr. Bon-
nell to these policies, by claiming that no right in the moneys due
on the policies could be asserted until the death of Lance.   It is
true that suits for the money to come due on the policies could
be brought only on Lance's death, but such litigation would be

Lance v. Bonnell.

against the insurance companies who would on Lance's death come to owe the money, and not against Mr. Bonnell or his representatives who claimed to own the policies. The laches consisted in the acquiescence in Bonnell's claim and action as absolute owner of the policies for a long period after it is now claimed by the complainants William L. Lance was entitled to have the policies delivered to him.

The statute of limitations is also set up by the defendant and this court is asked to apply it in analogy to the practice in the court of law. The first point to be ascertained on this contention is when did the complainant's right of action accrue? There can be no doubt that the right of a pledgee in the thing pledged for the payment of a debt, ceases as soon as the lien is discharged by the tender or payment of the debt. *Lawrence v. Maxwell, 53 N. Y. 19.*

The executors of Lance claim that the pledge was under a parol contract, that the debt has been fully satisfied by the sales of coal, of lots and finally of the residue of the "Gould tract" by Bonnell. This sale of the residue to the Lehigh and Wilkesbarre Coal Company was made in 1878 as above shown. The lien of Mr. Bonnell on the policies as pledgee, according to the Lances' theory of the case was, therefore, then discharged, and all his interest in the policies ended. The right of the Lances to recover the pledge was therefore perfect in 1878 upon their own showing. The policies both stood in the name of Bonnell. A suit in equity to compel their reassignment by Bonnell to Lance has, upon this view of the case, been maintainable since February, 1878. Bonnell's attitude both before and since that time has been consistently that of one claiming to be absolute owner, hostile to the Lances to their knowledge.

The suit in Philadelphia set up no claim to these policies, though the proceedings there had show that the Lances claimed to have discharged all their indebtedness to Mr. Bonnell, and the prayer of the bill is for an accounting. A prayer for the retransfer of the policies would have been pertinent to a showing by the accounting that the indebtedness had been dis-

charged and they thereby released. The Lances contend that no·
suit could be brought until, by the death of William L. Lance,
Sr., the policies had become payable. This, as above shown, is
true only as to a suit against the insurance companies to recover·
the money, but is no answer to justify Lance's omission to de-
mand and sue for the recovery of the policies claimed by him to·
have been put in pledge. No such suit was brought within six
years after the right of William L. Lance, Sr., had, as the
Lances assert, become complete to recover the policies. No·
equity is shown against the setting up of the statutory bar·
applicable in such cases in the law courts; on the contrary all
the facts tend to show that the enforcement of the complainants'·
claim against the defendant would work an extreme hardship.
If the complainants are barred of any right to recover the·
pledge, they are also barred of any right to recover moneys which.
long afterwards come to be payable upon it.

· The question to which a great part of the proofs, and most of·
the argument, has been directed, was whether or not Mr. Bonnell·
has in fact been repaid from sales and profits from the Gould·
property the amounts he advanced to the Lances. In my judg-·
ment, this point must take but a subordinate place in the·
determination of this case, if there was no contract whereby·
the policies here in question were held by him in pledge for
a debt and redeemable by the application of proceeds from that
tract.

I have, however, examined the voluminous testimony upon
this question and the arguments of counsel thereon, and the
·weight of evidence does not sustain the contention of the Lances,
either that Bonnell originally took the title for their benefit, or·
that his receipts therefrom were to be accounted for to them.

Mr. Bonnell at all times held, with the knowledge and'
assent of the Lances, the full legal title to the premises, and·
claimed to be the absolute owner. The Lances assert an equity·
under a parol contract which they declare enabled Mr. Bonnell·
to secure the legal title. The fact is several times proven, though·
nowhere stated in the pleadings, that in 1870, when the sheriff's
sale divested the Lance title, they held but an undivided one—

Lance v. Bonnell.

half interest in the Gould tract. Mr. Pettebone held the other half. He was a heavy and also an exacting and grasping creditor of the Lances. They were in great financial difficulties and threatened with forced liquidation by the sheriff sales. Pettebone was always, as to the Lances, a hostile creditor, seeking to force them to pay. Mr. Bonnell was a friendly creditor, who desired to secure his money, but was also willing to delay a sale if that were possible. Mr. Pettebone's urgency prevented this, and the Lances found that the property would be forced to a judicial sale. It was so sold and was bid in by Mr. Pettebone for $21,000, who shortly afterwards conveyed it to Mr. Bonnell for $162,000.

The Lances claim that, by a parol agreement between Pettebone, Bonnell and themselves, this had been pre-arranged, and that the title was conveyed to Bonnell as security for the payment of their debt to him and for advances to be made, and that these being repaid, the property was to be reconveyed to them. The claim that there was any such bargain was, as above shown, overthrown in the Philadelphia suit, and the title of Bonnell was adjudged to be absolute and not as security. The intimation in the opinion of the supreme court on the appeal, that Bonnell held the balance of money raised from sales, if there was any such balance, as trustee, was not adjudicated, as the decree below in favor of Bonnell, found at Lance's request on the merits of the case, was not modified in any way. The weight of the evidence, going to show Bonnell to have held either as security or in trust, is quite insufficient to establish the Lances' claim. The written contracts of sale all vested absolute title, first in Pettebone and afterwards by Pettebone's deed in Bonnell. The interest of the Lances was divested by the sheriff's sale to Pettebone. If he took absolutely and without agreement to hold as security or in trust, then Bonnell's subsequent acquirement of the title from Pettebone was equally absolute. Pettebone testifies that his title was absolute; that outside of the papers reduced to writing there were no bargains. Mr. Bonnell testifies to the same thing. Mr. Tuthill, Bonnell's bookkeeper, testifies to a state-

ment made by Bonnell to William L. Lance, Sr., to the same effect, which was by the latter accepted without denial. That Mr. Bonnell was well disposed to the Lances, and willing to be generous and to deal with them liberally, is apparent all through the proofs. It is the evidence of this disposition of Mr. Bonnell which has led to this litigation. Mr. Bonnell in many ways showed his kindly feelings for the Lances. He permitted them to remain in possession to mine and ship the coal, and sell lots, for which he executed deeds, but he also turned them out without their resistance when they disobeyed his orders.

The most significant indication of this generous consideration of Bonnell for the Lances is shown in a letter which Bonnell wrote to his counsel, Mr. McClintock, shortly after he had purchased the Gould property, in January, 1871, wherein he declared that he had bought the property to secure his debt against the Lances, and that his voluntary purpose and intention is, if he can sell the property for a sum sufficient to discharge all liens and expenses and to reimburse him with interest and compensation for his time and trouble, to give the balance to the Lances. This letter is really the basis of the Lances' claim, and they insist it was a recognition of a contract by which the conveyance was made to Bonnell for their benefit, and which bound him to account to them and to reconvey when their debt to him was paid. The letter in my view had no such effect. It was written after the conveyance had been made to Mr. Bonnell, which vested the absolute title in him. It does not acknowledge that he had precedently bought under a contract to benefit the Lances, but states his voluntary purpose as to his future action. He testified in the Philadelphia suit that the letter was written without demand or solicitation from anybody, and his counsel, Mr. McClintock, to whom the letter was addressed and delivered, corroborates this statement. It was not written or sent to any of the Lances, and they did not even know of its existence for several years. Mr. McClintock's testimony as to the occasion which produced the letter shows its purpose and object. He states that Mr. Bonnell had called upon him on other business, and

Lance v. Bonnell.

"after doing whatever we went to the office to do, he was about leaving, I think the afternoon of that day, he said to me, 'now I feel friendly to the Lances, I have bought this property and if anything should happen to me, I desire to leave with you a memorandum of what my present voluntary intentions are,'"

and then the letter was written and left with McClintock as Bonnell's counsel. McClintock also testifies that none of the Lances ever asked for the letter, and that he had no idea that they had any knowledge of it whatever. This letter was written almost coincidently with the receipt of the title of the Gould tract by Mr. Bonnell; it was prepared at his own suggestion, without demand, was addressed and delivered not to the Lances but to his own counsel. Not only the letter itself, but the statement made by Bonnell accompanying its delivery to McClintock, show that it was a purely voluntary declaration on Bonnell's part originating without any contractual obligation whatever, and given in order that in case any mishap should come to him, there might be a permanent expression of his kind feeling for and purpose to help the Lances. Every fact which appears to charge Mr. Bonnell with a contractual obligation touching the Gould tract is explicable consistently with this view, and as the title was held by him by deeds which passed an absolute interest, it must be declared that those who assert that they should be deemed to have conveyed but a limited estate, have failed to sustain their allegations.

There are some incidents of proof tending to show admissions by Mr. Bonnell that he held this title only as collateral for the payment of the Lances' debt to him, notably the testimony of Mr. Ricketts. The present narration of these admissions is given by Mr. Ricketts twenty-six years after they were alleged to have been made, and while he now ascribes them to Mr. Bonnell, yet when a witness in the Philadelphia equity suit, in his testimony given in 1880, only nine years after the transaction, he testified, "this is the information which the Lances gave me *in the absence of Mr. Bonnell and Mr. Pettebone.*" Mr. Ricketts is undoubtedly fair-minded, but his memory in giving his present testimony is evidently at fault, for his explanation of its variance from that

given in 1880, to the effect that he heard these statements not only from the Lances but also from Mr. Bonnell, is directly contradictory of his evidence in 1880, when he swore touching these matters:

*"I don't think Mr. Bonnell ever told me directly anything about the character of the transaction at that time,* but the whole tenor and basis of our conversation was that he was Mr. Lance's friend in this transaction."

It is unnecessary to prolong this examination of the details of the great volume of testimony on these points or to consider the other matters disputed between the parties and argued by counsel with much force and acumen. The complainants have failed, for the reasons above stated, to show a right to the relief they seek, and a decree should be made in the suit regarding the Mutual Benefit policy dismissing their bill, and in the Penn Mutual case, adjudging to the defendant, the administratrix of Mr. Bonnell, the amount paid in upon the policy.