PRESENT: Lemons, C.J., Goodwyn, Powell, Kelsey, McCullough, and Chafin, JJ., and Millette, S.J.

DOROTHY P. DAY, SHAREHOLDER OF
M.C. CONSTRUCTION, INC., DISSOLVED

OPINION BY
v. Record No. 190603                                   JUSTICE D. ARTHUR KELSEY
                                                       OCTOBER 15, 2020

MCC ACQUISITION, LC, D/B/A VIRGINIA-
CAROLINA PAVING CO.

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Theodore J. Markow, Judge

The Treasurer of the Commonwealth of Virginia filed an interpleader action seeking a judicial resolution of two disputed claims of ownership of proceeds from the sale of unclaimed corporate stock. The circuit court held that the buyer of the original stock, not the seller, had a superior equitable claim of ownership and awarded the proceeds accordingly. In so ruling, the court necessarily rejected the seller's argument that the buyer's in rem claim was untimely under Code § 8.01-246, which imposes a five-year statute of limitations on in personam claims asserting breaches of written contracts. On appeal, the seller finds fault with the circuit court's reasoning as well as its result. Agreeing with both, however, we affirm.

I.

Prior to 1997, M.C. Construction, Inc. owned a membership interest in Virginia BCBS d/b/a Trigon Blue Cross Blue Shield, a mutual insurance company. In 1997, Virginia BCBS went through a demutualization process that converted it from a mutual company into a stock company. The demutualization converted M.C. Construction's membership interest in Virginia BCBS into Class A common stock of the surviving company, Trigon Healthcare, Inc.

In 1999, MCC Acquisition, LC paid $1.7 million to purchase all of the assets of M.C. Construction. With certain exceptions not relevant here,[1] the list of assets purchased included "all of the assets of Seller, both tangible and intangible, of every kind and nature, wheresoever situate and howsoever held," 1 J.A. at 16. The purchase agreement later led to an assignment agreement that stated: "Seller hereby transfers, conveys and assigns all Seller's rights, title and interest in the Assets" to the Buyer. *Id.* at 166.

Though the agreements required M.C. Construction to transfer all of its assets (including the Trigon stock) to MCC Acquisition, M.C. Construction never delivered the stock certificates because it had never possessed them. The circuit court found no evidence suggesting that Trigon had ever issued any stock certificates or that it had ever delivered any such certificates to M.C. Construction.[2]

In 2002, Anthem, Inc. acquired Trigon, and then in 2004, WellPoint, Inc. merged with Anthem and converted the stock into WellPoint stock. Because no entity had previously claimed the stock, WellPoint transferred the newly minted WellPoint stock (registered in the name of M.C. Construction) to the Unclaimed Property Division within the Department of the Treasury.

---

[1] Day contends on appeal that the newly created stock was excluded from the 1999 purchase agreement because of a provision exempting "tax records, minute books and stock records," 1 J.A. at 151. The circuit court disagreed with this argument, as do we. A corporate stock record is simply a record of the company's stock that notes the stock's registered owners and transfers as well as other facts concerning the stock. *See* Code § 13.1-770(C). *See generally* 5A William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 2191, at 181-82 (2020 rev. vol.) (describing "[s]tock books and records"). A stock record is not the same thing as the stock itself, just as a record of cash reserves is not the same thing as the cash itself.

[2] In this case, the facts are somewhat unique in that neither party was aware of the existence of the stock at the time the parties entered into the agreements. However, during litigation, Day admitted that the stock had been an asset of M.C. Construction at the time of the purchase agreement. *See* 1 J.A. at 141. Therefore, because the stock was not an excluded asset, *see supra* note 1, it was necessarily included as an asset under the terms of the agreements even though the agreements did not specifically identify the stock.

2

By that time, M.C. Construction had been liquidated, and Day owned all of the assets of the dissolved corporation. The Treasurer sold the stock, filed an interpleader action, and deposited the funds with the circuit court.

In the circuit court, Day and MCC Acquisition asserted their competing claims to the proceeds after the court had dismissed the Treasurer from the interpleader action. MCC Acquisition also asserted an in personam claim for indemnity for fees and costs against Day based upon her failure to assist MCC Acquisition in obtaining the proceeds of the sale, which MCC Acquisition argued that Day was required to do under the purchase agreement. In response, Day asserted that M.C. Construction had never transferred (or intended to transfer) the Trigon stock to MCC Acquisition in 1999 pursuant to the purchase agreement. MCC Acquisition could not complain about that failure, Day argued, because it had not filed a breach of contract claim against M.C. Construction within the five-year statute of limitations governing written contracts. Day also asserted an in personam claim for indemnity based upon MCC Acquisition's breach of the purchase agreement by pursuing its claim to the funds.

The circuit court found none of Day's arguments persuasive. "The problem with [Day's] argument," the court explained, "is that while the [Trigon] stock is conceded to have been in existence[,] there is no evidence that supports that the certificates were ever issued until delivery to the Treasurer in 2008. There was nothing to execute and deliver at the time of the sale." 2 *id.* at 404. What M.C. Construction had actually owned was a "chose in action," and that was the intangible asset that the purchase and assignment agreements had transferred to MCC Acquisition. *See id.*

Under the court's reasoning, it did not matter that M.C. Construction had not produced any stock certificates at closing. No evidence suggested that Trigon had ever issued stock certificates or that it had delivered any such certificates to M.C. Construction. Based upon these

3

facts, the circuit court held that MCC Acquisition had obtained "equitable title" to the interpleaded stock proceeds. *See id.* In so ruling, the court necessarily rejected Day's statute-of-limitations argument. The court also denied the parties' competing in personam cross-claims against one another, but neither party has appealed those rulings. Thus, the only claims before us are the parties' competing in rem claims to the res, the proceeds of the stock sale.

## II.

The circuit court awarded the interpleaded stock proceeds to MCC Acquisition, finding that it had the superior equitable claim to the res. On appeal, Day contests this finding as well as the court's rejection of her statute-of-limitations argument. We are unpersuaded by either argument.

## A.

We must first frame the true nature of this dispute on appeal. This action began as, and remains still, an interpleader suit initiated by the Treasurer. Code § 8.01-364(A) defines an interpleader dispute as competing claims "to the same property or fund," that is, the res placed in the custody of the court — not as a dispute between claimants *against each other* seeking an award of damages. *Cf.* Code § 46.2-458 (authorizing the Treasurer to "proceed in equity by bill of interpleader" regarding deposits held pursuant to Chapter 3 of Title 46.2 of the Code). Because competing in rem claims to the specific res are the core object of an interpleader action, a court may order an injunction barring the parties from participating in other proceedings "affecting the property," Code § 8.01-364(C). This case is not a breach of contract dispute.[3] No

_____

[3] Parties to an interpleader action under Code § 8.01-364 may file in personam claims against each other seeking damages for breach of contact. *See* Rule 3:10(a) (allowing cross-claims); Rule 3:15 (stating that statutory interpleader proceedings "shall, to the extent not inconsistent with the governing statutes, be conducted in accordance with the Rules contained in this Part Three"); *Settlement Funding, LLC v. Von Neumann-Lillie*, 274 Va. 76, 78-79 (2007) (describing how the claimants in an interpleader suit had filed cross-claims against one another,

4

party has asserted, briefed, or argued on appeal a damages claim alleging a breach of contract. Understandably so. The circuit court denied both parties' in personam cross-claims, and neither party has appealed those rulings. In short, no party currently maintains a claim against the other for anything.

Underneath the textual surface of our interpleader statute is a dense substrata of equitable jurisprudence. *See generally* William Minor Lile, Notes of Lectures on Equity Jurisprudence 249-53 (1921); 4 John Norton Pomeroy, A Treatise on Equity Jurisprudence §§ 1320-29, at 3168-88 (4th ed. 1919); 2 Joseph Story, Commentaries on Equity Jurisprudence §§ 800-24, at 129-52 (7th ed. 1857).[4] When interpreting statutes addressing common-law subjects, we read them in conformity with the preexisting common law to the greatest extent possible. *See Tvardek v. Powhatan Vill. Homeowners Ass'n*, 291 Va. 269, 276 n.4 (2016). A parallel canon of statutory interpretation applies to statutes codifying equitable proceedings. *See, e.g.*, *Young v. United States*, 535 U.S. 43, 49-50 (2002) (incorporating the "background principle" of equitable tolling into a statute of limitations governing bankruptcy courts, "which are courts of equity" that "apply the principles and rules of equity jurisprudence" (alteration and citation omitted)).

To the extent that it is textually reasonable, therefore, interpleader statutes should be interpreted in harmony with their equitable provenance. *See* 4 Pomeroy, *supra*, § 1329, at 3186-

including for breach of contract). No such in personam claims remain in this case, however. *See Seitz v. Federal Nat'l Mortg. Ass'n*, 909 F. Supp. 2d 490, 503 (E.D. Va. 2012) (stating that a suit that is either in rem or quasi in rem "does not lose that nature simply because [the claimant] seeks monetary damages in addition to title to property"); Rufus Waples, A Treatise on Proceedings In Rem § 621, at 767 (1882) ("When a thing is seized; charged with guilt, hostility or indebtedness; and condemned as bearing primary responsibility, the action against it is not the less one in rem because some pleader has asked, and some court has granted, a personal judgment against the owner of that thing, at the same time.").

[4] *See also* 1 Charles E. Hogg, Equity Procedure §§ 139-47, at 218-24 (1903); Elias Merwin, The Principles of Equity and Equity Pleading §§ 890-97, at 501-06 (H.C. Merwin ed., 1895); Christopher G. Tiedeman, A Treatise on Equity Jurisprudence §§ 566-74, at 657-67 (1893).

88 (characterizing an interpleader statute as "a mere substitute for the equitable remedy" that "is governed by the same rules" as the equitable remedy unless the statute provides otherwise). Interpleader statutes can, and often do, explicitly "change the equitable doctrines" and "enlarge their scope of operation," but absent clear legislative intent to do so, such statutes do "not alter the settled doctrines concerning interpleader." *See id.*

B.

With that background, we turn to the main issue in this case: Which of the two competing claimants has the superior equitable claim to the interpleaded stock proceeds? The circuit court found that MCC Acquisition did. No evidence, the court held, suggested that Trigon had ever issued stock certificates to M.C. Construction. Nor was there any evidence that Trigon had delivered any stock certificates to M.C. Construction. If such a delivery had occurred, the court reasoned, then the WellPoint stock would never have been delivered to the Treasurer as unclaimed property. *See* 2 J.A. at 404. The most likely scenario, the court reasonably inferred, was that M.C. Construction had owned only a "chose in action" concerning the Trigon stock. *See id.*

Challenging the circuit court's reasoning, Day assumes that M.C. Construction had to transfer title to the Trigon stock to MCC Acquisition at closing through the methods specified in the Uniform Commercial Code ("UCC"). In response, MCC Acquisition argues that these mechanisms were not requisite to transfer *equitable* title to the stock. MCC Acquisition purchased an intangible chose in action, not a stock certificate. The chose in action was simply M.C. Construction's legal right to the stock. That right passed by operation of law to MCC Acquisition upon the completion of the purchase and assignment agreements and the payment of the purchase price. The circuit court found this reasoning persuasive, as do we.

6

In Virginia, a "chose in action" broadly includes any "personal right not reduced into possession, but recoverable by a suit at law." *First Nat'l Bank of Richmond v. Holland*, 99 Va. 495, 503 (1901) (citing 2 James Kent, Commentaries on American Law 432 (George F. Comstock ed., 11th ed. 1866)); *see also Huaman v. Aquino*, 272 Va. 170, 175 (2006). "Any right which has not been reduced to possession is a chose in action." *Holland*, 99 Va. at 503. Many jurisdictions treat "shares of stock" as "choses in action" or as "being in the nature of choses in action." *See* 11 William Meade Fletcher & Carol A. Jones, Fletcher Cyclopedia of the Law of Corporations § 5098, at 98-99 (2019 rev. vol.) (citing cases).[5] Virginia is no exception. "A share of stock of a corporation is intangible personal property partaking of the nature of a chose in action; and [it is] considered as a res (i.e., a thing separate and apart from its ownership or the possession of the certificate evidencing the ownership thereof) . . . ." *Iron City Sav. Bank v. Isaacsen*, 158 Va. 609, 628 (1932). "A share certificate in a corporation," after all, "is not the share itself." 11 Fletcher & Jones, *supra*, § 5092, at 64.

In this case, M.C. Construction owned a chose in action entitling it to the intangible personal property interest in the stock itself. The 1999 purchase agreement conveyed to MCC Acquisition "all of the assets of [M.C. Construction], both tangible and intangible, of every kind and nature, wheresoever situate and howsoever held." 1 J.A. at 16. The assignment agreement stated that M.C. Construction "transfers, conveys and assigns all [its] rights, title and interest in the Assets" to MCC Acquisition. *Id.* at 166. The Trigon stock — by its nature an intangible chose in action — was incontestably within the scope of both of those provisions. As is the case

---

[5] *See also* 1 William W. Cook, A Treatise on the Law of Corporations Having a Capital Stock § 12, at 59 (7th ed. 1913); 1 Victor Morawetz, A Treatise on the Law of Private Corporations §§ 193, 225-26, at 189-90, 219 (2d ed. 1886); 4 Seymour D. Thompson & Joseph W. Thompson, Commentaries on the Law of Private Corporations § 3467, at 85 (2d ed. 1909).

with all equitable conveyances of intangible property interests, the Trigon stock was transferred *intangibly*.

MCC Acquisition paid the purchase price and thereby acquired an equitable right to the interpleaded stock proceeds superior to that of M.C. Construction. It is legally irrelevant that, after the sale and assignment, Trigon or WellPoint continued to maintain the stock in the name of M.C. Construction. MCC Acquisition obtained *equitable title* to the stock by operation of the purchase and assignment agreements. Under Virginia law, nothing more needed to be done to place MCC Acquisition in a superior position to M.C. Construction as the equitable owner of the stock. *See J.G. Wilson Corp. v. Cahill*, 152 Va. 108, 114-18 (1929) (holding that the failure to comply with statutory requirements for the transfer of stock did not diminish the transferee's superior equitable title); *Reed v. Gold*, 102 Va. 37, 45-47 (1903) (holding that, for purposes of the statute of frauds, title to stock may be transferred even when "the usual written evidence of title is absent" (citation omitted)); *Holland*, 99 Va. at 501-03 (holding that the delivery of an unendorsed stock certificate, with the intention of transferring title through the gift, operates to transfer equitable title to the stock).[6]

---

[6] On these points, Virginia law is consistent with the traditional view of equitable title. *See generally* 1 Charles Fisk Beach, Jr., Company Law: Commentaries on the Law of Private Corporations § 62, at 127 (1891) ("The possession of a stock certificate is not necessary to the ownership of shares; it is merely a convenient voucher thereof."); 2 *id.* §§ 678-83, at 1066-76 (discussing transfers of stock and concluding that unrecorded transfers pass equitable title); 5 William Meade Fletcher, Cyclopedia of the Law of Private Corporations §§ 3427, 3483, at 5610-14, 5752-53 (1918) (stating that a certificate is not necessary to make one a stockholder and that the stockholder without a certificate has equitable title to, i.e., "is the beneficial owner" of, the stock); 6 *id.* § 3785, at 6313 (1919) ("In the absence of express provision to the contrary, stock may be transferred by delivery of a separate written transfer, without the delivery of any certificate, especially where no certificate has ever been issued . . . ." (footnote omitted)); *id.* § 3788, at 6316-17 (stating that transfers not made in accordance with statutory or corporate requirements, but that would be sufficient under the common law, generally convey at least equitable title warranting the protection of an equity court); *id.* §§ 3794-95, at 6331-38 (stating that unregistered transfers of stock convey at least equitable title between the grantor and grantee); Abbott Lawrence Lowell & Francis C. Lowell, The Transfer of Stock in Private

As between an assignor and assignee, the validity and efficacy of an assignment in the stock context depends upon the validity and efficacy of the assignment instrument, not upon the physical possession of a properly endorsed stock certificate or the recordation of that assignment on the books of the corporation. "Neither the corporation's records nor the outstanding stock certificates . . . are a verity," *Young v. Young*, 240 Va. 57, 62 (1990),[7] and thus, "possession of certificates and recordation of them in the corporation's records is not dispositive of the issue of true ownership," *Barber v. VistaRMS, Inc.*, 272 Va. 319, 328 (2006). *See generally* Allen C. Goolsby & Steven M. Haas, Goolsby & Haas on Virginia Corporations § 6.6, at 76-77 (6th ed. 2017); 10 William R. Waddell & Lee A. Handford, Virginia Practice Series: Business Entities § 2:4, at 62 (2020 ed.).

The concept of equitable assignment of stock is not a novel one. Under settled principles,

> there may be a transfer of title *as between the parties* without any such delivery amounting to a transfer of possession. The contract is executed, and the title passes, if such is the intention of the

---

Corporations § 47, at 47-48 (1884) (stating that transfers in violation of statutory or corporate requirements transfer equitable title); *id.* §§ 80-104, at 82-114 (stating that a record of a transfer on the books of the corporation is not necessary to pass either legal or equitable title and that the failure to record a transfer on the books of a corporation does not deprive the purchaser of at least an equitable title); 1 Morawetz, *supra* note 5, § 174, at 174 (stating that an assignment of shares not executed in conformity with corporate requirements still conveys a "beneficial interest" in the shares and that "the equitable rights of the beneficiary will be protected and enforced by a court of equity"); *id.* § 194, at 190 (stating that the rule that an assignment of a chose in action confers equitable rights applies to assignments of shares); *id.* § 196, at 191 ("A transfer on the books is required merely to perfect the strictly legal title as against the corporation; the equitable rights of the shareholder pass by a simple assignment.").

[7] In the unique context of inter vivos gifts, Virginia follows the traditional rule that "there must be such actual or constructive delivery as divests the donor of all dominion and control over the property and invests it in [the] donee," *Taylor v. Smith*, 199 Va. 871, 874 (1958). "Donative intent without delivery is insufficient to complete a gift." *Knop v. Knop*, 297 Va. 553, 560 (2019). Delivery is a requirement of the law of gifts, not the law of equitable assignments for consideration. *See id.* at 559-60 (stating the requirements for a valid gift); *Young*, 240 Va. at 62 ("Because the daughters paid no consideration for [the shares], principles governing gifts inter vivos apply."); *Yancey v. Field*, 85 Va. 756, 759 (1889) (stating that a transaction is not valid as a gift if delivery is absent "and, being without consideration, it is not a contract to be executed").

> parties, even though the stock may remain in the name or in the possession of the seller . . . .

12A William Meade Fletcher & Carol A. Jones, Fletcher Cyclopedia of the Law of Corporations § 5613, at 346-48 (2017 rev. vol.) (emphasis added) (footnote omitted); *see also id.* § 5626, at 443 ("The adoption in a given jurisdiction of Uniform Commercial Code Article 8 governing investment securities does not abrogate equitable principles established in prior decisions that, as between the parties, there may be a transfer of ownership of stock in a corporation where the owner presently intends to make the transfer, even though there is some technical defect in the mode of transfer."); 12 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 5481.50, at 267 (2020 rev. vol.) (observing that "common law rules and equitable doctrines are still relevant in certain situations, as where the dispute is between the transferor and transferee, or where the transferee does not qualify as a 'purchaser'" (footnote omitted)); Mark S. Rhodes, Transfer of Stock § 6:3, at 325-27 (7th ed. 2006 & Supp. 2020) (stating that an assignment without delivery may pass at least equitable title).

Nor have we ever thought it "indispensable to the validity" of a stock assignment between the parties to the assignment "that there should have been any endorsement on the certificate" or any recordation of the "transfer" on the corporate books. *Looman v. Rockingham Nat'l Bank*, 220 Va. 954, 960 (1980) (discussing *Holland*). *See generally* 12 Fletcher, *supra*, § 5489, at 287-90, 294-96 (stating that a transfer on the books is not necessary for the validity of a transfer between the parties and citing, inter alia, *Looman* and *J.G. Wilson Corp.*); *id.* § 5496, at 311-14 ("Although a transfer of stock between individuals must be registered on the corporation's books to receive recognition by the corporation, an unregistered transfer is nevertheless binding between the parties, with equitable title passing to the transferee. . . . As

10

between the parties, the title passes by contract and not by the record." (footnote omitted)).[8] The reason why is as practical as it is conceptual. "It is quite possible and often happens, for reasons of convenience or otherwise, that stock held in the name of one person really belongs to another." *Barber*, 272 Va. at 328 (alteration omitted) (quoting *Swan v. Swan's Ex'r*, 136 Va. 496, 519 (1923)); *see also Young*, 240 Va. at 62 (same). For these reasons, MCC Acquisition was the equitable owner of the Trigon stock.

2.

Day contends that the UCC supersedes all prior precedent on these points and forbids any transfer of corporate stock that does not comply with the statutorily recognized methods of delivery. We disagree. The sections upon which she relies appear in Article 8 of the UCC, titled "Investment Securities," and were codified in Title 8.8A of the Virginia Code. Article 8, however, "is not a comprehensive codification of all of the law governing the creation or transfer of interests in securities." Code § 8.8A-302 uniform commercial code cmt. 2. "Similarly, Article 8 does not determine whether a property interest in certificated or uncertificated security is acquired under other law, such as the law of gifts, trusts, or equitable remedies. Nor does Article 8 deal with transfers by operation of law." *Id.*; *see also* Code § 8.1A-103(b) (reaffirming that "the principles of law and equity" supplement the UCC "[u]nless displaced by [its] particular provisions").

---

[8] "It has also been held that, under most circumstances, a transfer on the books may vest legal title but is not necessarily determinative of such transfer as will have the effect of transferring equitable title or the beneficial ownership of the stock." *Jones v. Central States Inv. Co.*, 654 P.2d 727, 733 (Wyo. 1982) (citing *Looman*, 220 Va. at 959-60). "A book transfer speaks only to the issues of record ownership, and not of legal or equitable title and is not a condition precedent to a valid transfer as between the parties to the transaction." *Id. See generally* 12 Fletcher, *supra*, § 5488, at 284-87 (stating that the failure to comply with statutory or corporate requirements does not necessarily render a transfer void as between the parties); *id.* §§ 5496-97, at 311-20 (stating that unregistered transfers pass equitable title).

11

Given the clarity of the UCC's intended reach, we agree that "[t]he provisions of Article 8 relating to transfer are concerned with the transfer of title and do not constitute a statement of the law as to any party's *equitable* rights," 8 David Frisch & Scott Siegner, Lawrence's Anderson on the Uniform Commercial Code § 8-101:19, at 22 (3d. ed. 2017 rev. of vol. 8) (emphasis added).

> When the intent to transfer stock ownership is clear, that intent will be given effect as between the parties under a non-Code equitable assignment rule even though there ha[ve] been some technical irregularities such as the failure to indorse the original certificates surrendered to the corporation or the failure to deliver the new certificate to each of the co-owners named in the certificates.

*Id.* § 8-309:10, at 263. In short, "[t]he rule of equitable assignment of corporate stock has not been abrogated by the Code" and therefore, "*as between the parties*, there may be a transfer of ownership of stock in a corporation where the owner presently intends such a transfer even though there is some technical defect in the mode of transfer." *Id.* § 8-313:9, at 297 (emphasis added).[9]

## C.

The circuit court's correct resolution of the ownership issue exposes the recursive nature of Day's statute-of-limitations argument. By assuming away the equitable nature of MCC

---

[9] *See, e.g.*, *Miller v. Wahyou*, 235 F.2d 612, 615 (9th Cir. 1956) (concluding that Nevada would follow the cases that "have said that an assignment of a shareholder's interest without delivery of the certificates operates to vest an equitable title in the assignee" even under the Uniform Stock Transfer Act and collecting cases); *Mortgage Invs. Corp. v. Battle Mountain Corp.*, 93 P.3d 557, 560 (Colo. App. 2003) (agreeing with other states that hold "that the adoption of the Uniform Commercial Code does not abrogate the principle allowing equitable transfer of stock").

We note here that this case only requires us to address the equitable rights of the parties to the purchase and assignment agreements. We do not address the rights of third parties to the agreements. *See, e.g.*, *Mortgage Invs. Corp.*, 93 P.3d at 560 ("However, equitable title claims are recognized in Colorado only where the rights of third parties would not be affected.").

Acquisition's claim to the res, Day mistakenly concludes that the statute of limitations barred the assertion of that claim and the consequent entry of the court's in rem judgment.

A "judgment in rem," or an "in rem judgment," is a "judgment that determines the status or condition of property and that operates directly on the property itself." Black's Law Dictionary 1008 (11th ed. 2019); *see Gelston v. Hoyt*, 16 U.S. (3 Wheat.) 246, 313 (1818) (Story, J.) (observing that an in rem "decree of the court acts upon the thing in controversy, and settles the title of the property itself"); 4A Charles Alan Wright, Arthur R. Miller, & Adam N. Steinman, Federal Practice and Procedure — Civil § 1070, at 447-48 (4th ed. 2015) ("The essential function of an action in rem is the determination of title to or the status of property located — physically or legally — within the court's jurisdiction.").[10]

An in rem judgment should not be confused with a "judgment in personam," i.e., a "personal judgment," *see* Black's Law Dictionary, *supra*, at 1008-09 (defining the terms separately), which "imposes a personal liability or obligation on one person in favor of another," *Hanson v. Denckla*, 357 U.S. 235, 246 n.12 (1958). As Judge Burks has explained:

> An action is in personam when its object is to obtain a personal judgment against the defendant, upon which a general execution may be awarded directing the collection of the judgment out of any property of the defendant anywhere to be found. It is in rem when it seeks to affect particular portions of his property only.

---

[10] *See also* 2 Henry Campbell Black, A Treatise on the Law of Judgments § 792, at 1198-1200 (2d ed. 1902) (discussing various definitions and approving, with qualifications, a definition describing an in rem judgment as "an adjudication pronounced upon the status of some particular subject-matter" and "founded on a proceeding instituted, not against the person, as such, but against or upon the thing or subject-matter itself whose state or condition is to be determined" (citation omitted)); Waples, *supra* note 3, § 20, at 23 ("The action in rem is distinguished from that against a person in its vindication of a pre-existing right in or to property primarily liable, by the seizure and prosecution of such property, without any suit against its owner."); *id.* § 110, at 152 ("It is therefore true, of all proceedings in rem, that their object is to ascertain the *status* of the property proceeded against." (emphasis in original)).

Martin P. Burks, Common Law and Statutory Pleading and Practice § 42, at 79 (T. Munford Boyd ed., 4th ed. 1952); *see also O'Hara v. Pittston Co.*, 186 Va. 325, 336 (1947).

In an interpleader proceeding in which no in personam claims by the parties against one another remain, the competing ownership claims against the res are, by definition, in rem claims seeking only an in rem judgment.[11]  This point undermines Day's reliance upon the statute of limitations codified at Code § 8.01-246, which bears the title, "Personal actions based on contracts."  In this statutory context, "personal" simply means "in personam" claims, which are wholly different from "in rem" claims.  *See* Garner's Dictionary of Legal Usage 460-61 (3d ed. 2011).  The text of the statute also makes it especially clear that the limitation applies only to in personam claims because it refers to "actions founded upon a contract," Code § 8.01-246.  As noted earlier, however, MCC Acquisition no longer maintains a claim against Day for breach of contract.  Because there is no remaining "[p]ersonal" claim "founded upon a contract" to adjudicate, Code § 8.01-246's limitation on breach of contract claims has no relevance to this appeal.[12]

---

[11] Though the distinction is a subject of considerable confusion, an "in rem judgment" must be distinguished from "in rem jurisdiction."  *See* 2 Black, *supra* note 10, § 792, at 1199 (criticizing John Marshall's definition of an in rem proceeding, which was based upon how process is to be served, as "not so much a definition as a test, having reference solely to the question of jurisdiction"); Black's Law Dictionary, *supra*, at 1008, 1019 (defining the terms separately); 4A Wright, Miller, & Steinman, *supra*, § 1070, at 447 (emphasizing the importance of "distinguish[ing] actions based on property from those based on personal jurisdiction because of their different legal consequences").  The phrase "in rem judgment" describes the nature of the court's order based upon the nature of the parties' claims to the specific res.  The phrase "in rem jurisdiction," on the other hand, refers to the court's ability to issue a binding personal judgment, consistent with due process principles, upon parties not present within its jurisdiction.

[12] "Because interpleader has its roots in equity, it is subject to certain equitable doctrines such as laches."  *Mutual Life Ins. of N.Y. v. Bohart*, 743 F.2d 313, 325 (5th Cir. 1984) (noting the applicability of laches to the stakeholder); *see, e.g.*, *John Hancock Life Ins. of N.Y. v. Solomon Baum Irrevocable Family Life Ins. Tr.*, 357 F. Supp. 3d 209, 220-21 (E.D.N.Y. 2018) (applying laches to bar an interpleader claimant's claim to insurance proceeds), *aff'd*, 783 Fed. Appx. 89, 91 (2d Cir. 2019) (per curiam); *Dickinson v. Griggsville Nat'l Bank*, 111 Ill. App. 183, 186

III.

In sum, the circuit court correctly awarded the interpleaded stock proceeds to MCC Acquisition. Exercising its equitable powers in this interpleader case, the court found that MCC Acquisition had obtained equitable title to the Trigon stock. The circuit court also correctly rejected Day's statute-of-limitations argument. Code § 8.01-246's five-year limitation on in personam claims seeking damages for breach of contract does not apply to MCC Acquisition's in rem claim to the interpleaded stock proceeds. We therefore affirm the judgment of the circuit court.

*Affirmed.*

---

(1903) (finding no laches in assertion of claim to interpleaded stock), *aff'd*, 70 N.E. 593, 595 (Ill. 1904); *Lance v. Bonnell*, 43 A. 288, 292-94 (N.J. Ch. 1899) (applying laches to an interpleader claimant's claim to insurance proceeds). Because the parties have not addressed on appeal the applicability, if any, of laches to MCC Acquisition's in rem claim, neither do we.